## LLOYD RADKE v. PRESTON BRENON AND ANOTHER.

134 N. W. (2d) 887.

April 15, 1965—No. 39,166.

*Harry N. Ray*, for appellants.
*Jerome A. Gotlieb*, for respondent.

ROGOSHESKE, JUSTICE.

Defendants appeal from a judgment of the district court decreeing specific performance of a contract for the sale of real estate.

The judgment was entered upon findings made after trial that "subsequent to the Defendant acquiring" the property in question they "did offer to sell the property to the Plaintiff for the sum of Two Hundred Sixty-two ($262.00) Dollars, which offer the Plaintiff did accept"; and that "at all times relevant, the Plaintiff has been ready, willing and able to complete the agreement for the sale of Defendants' property but the Defendants have refused to do so." The court concluded that defendants "have wrongfully and improperly failed and refused" to deliver a deed of the property to plaintiff.

Resolving the conflicts in the evidence in plaintiff's favor, as we must, these appear to be the facts. Plaintiff and defendants are neigh-

bors owning adjoining lots in Wakefield Park addition in Ramsey County. At the times each acquired ownership, their lots and eight neighboring lots did not extend to the west shoreline of Wakefield Lake, located nearby. The strip of land between the shoreline of the lake and the east boundary of the platted lots was owned by Dr. Gulden, the developer of the addition, and his brother. They had been hopeful of selling the entire strip to the county for use as a park, but when the county finally declined the offer in 1956, Dr. Gulden attempted to sell to the several owners separated from the lake. These attempts were unsuccessful until December 1, 1959, when defendants acquired ownership of the entire strip. Preston Brenon, hereinafter referred to as defendant, was a licensed real estate agent. Following his purchase, he had the property surveyed, and on June 28, 1960, he sent an identical letter to plaintiff and the eight other neighbors offering to sell them the irregular parcels that separated their lots from the lake. In the letter he explained that since he was interested only in that part of the strip adjoining his property, he had no desire to retain the remainder. He stated he had "no desire to make any profit on this transaction if everyone owning adjoining property is willing to buy their portion" and divide the cost "equally among all 10 including [him]self." He itemized the total cost at $2,120 and offered to sell each lot for $212 on any terms agreeable. This letter was not signed by defendant but his name was typewritten thereon, he having authorized this and considered such to be tantamount to his signature. Previous to the receipt of this letter, plaintiff and defendant had discussed the latter's intent of acquiring the property for the neighborhood on at least two occasions. About 2 weeks after plaintiff received this offer, he orally accepted it. Sometime later, plaintiff learned from a neighbor that two neighbors declined to purchase, and thus the divided cost of each lot was increased to $262. Although he was agreeable to pay the increase, he did not immediately so inform defendant. Despite defendant's progress in completing sales to other interested neighbors, plaintiff, for reasons not explained except that he believed he was waiting for defendant to furnish him a copy of the survey and an abstract, delayed making a request for the abstract until

May 7, 1961. On cross-examination, he admitted that the survey was received by him with the June 28 letter. In any event, it is clear that plaintiff accepted defendant's offer on May 7, at which time plaintiff knew of the price increase. Defendant testified:

"Q. * * * And did he agree to buy that time?
"A. At that time he did."

Later in May, defendant delivered to plaintiff a stub abstract covering entries from July 2, 1947, to May 9, 1961. At that time plaintiff offered "some money" but was told by defendant to "wait till it's all settled." There was a further delay before a title opinion could be given, made necessary when plaintiff's attorney insisted on procuring a complete abstract. On August 14, plaintiff delivered to his attorney a check for $262 payable to defendants for the purpose of completing the sale. On August 16, plaintiff's attorney wrote defendant informing him that he held the check for payment of the sale price to be delivered on receipt of a deed. Sometime after August 16, plaintiff received a letter from defendant dated August 16 informing him that the offer to sell was revoked.

From the time plaintiff bought his home in 1953, he occupied the parcel of land in dispute with consent of the owners. During the period it was owned by the Guldens, he cleaned, filled, graded, and planted grass upon it. However, after defendant purchased it, he did no more than continue to maintain the grass, fill in some "low spots that kind of wash away," and plant "a few trees."

The question is whether these facts establish a valid and enforceable contract for the sale of land. Defendants contend they do not.

As admitted by defendant, an oral contract to sell the land was made, and the trial court was clearly justified in so finding. There being no formal, integrated, written contract, however, the problem is whether the oral contract is unenforceable because it comes within Minn. St. 513.05[1] of the statute of frauds. Briefly, that pro-

---

[1]Minn. St. 513.05 provides: "Every contract for the leasing for a longer period than one year or for the sale of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum there-

vision decrees void any contract for the sale of lands unless the contract or some memorandum of the contract is in writing. The precise issue in this case is whether, under the circumstances, the letter written by defendant offering the land to plaintiff is a memorandum sufficient to satisfy the requirements of the statute.

The statute expresses a public policy of preventing the enforcement by means of fraud and perjury of contracts that were never in fact made. To inhibit perversion of this policy by those who would deny an oral contract actually made, the statute itself permits enforcement of an oral contract if there exists a note or memorandum as evidence of the contract. To the courts, then, is left promotion of the policy of the statute, either by denying enforcement urged by defrauders or by granting enforcement against wrongful repudiators. As an aid in this objective, the statute itself lists some requisites of a memorandum and this court has added others, so that we have some indication of what content a memorandum normally must have in order to be sufficient evidence of the contract.

The statute requires that the writing express the consideration and that it be subscribed by the party by whom the sale is to be made or by his lawful agent authorized in writing. This court has stated that the memorandum is sufficient when, in addition to the above requirements, it states expressly or by necessary implication the parties to the contract, the lands involved, and the general terms and conditions upon which the sale will be made.[2]

These latter elements are clearly present in the letter written by defendant. Plaintiff's name is included in the inside address heading the letter, and Brenon's name is typewritten at the bottom. The land to be sold is positively delineated. The letter offers "their portion" to "everyone owning adjoining property," and the survey map accom-

---

of, expressing the consideration, is in writing and subscribed by the party by whom the lease or sale is to be made, or by his lawful agent thereunto authorized in writing; and no such contract, when made by an agent, shall be entitled to record unless the authority of such agent be also recorded."

[2]Doyle v. Wohlrabe, 243 Minn. 107, 66 N. W. (2d) 757; Swallow v. Strong, 83 Minn. 87, 85 N. W. 942.

panying the letter depicts each tract. Considering the conversation both before and after the letter was sent, it is inconceivable that the parties could be uncertain concerning the land to be sold. As to other terms of the contract, such as manner of payment, Brenon merely held himself ready "to work out any kind of terms" with the purchasers.

The elements expressly required by statute are not so obvious. First, the consideration of $212 stated in the letter is not the same as the $262 tendered in accord with the oral understanding. Despite this discrepancy, we think that the letter sufficiently expresses the consideration because the $212 represented an equal share of the cost divided by all ten interested parties. As Brenon said in the letter, "I feel the only fair way to share the cost is to divide equally among all 10 including myself." There is no dispute that the price was changed from that stated in the letter when two property owners declined to buy. The consideration then was simply a mathematical computation according to the formula specified in the letter.[3] We do not believe this variation in the dollar amount renders the letter's expression of the consideration insufficient, especially since plaintiff paid more under the admitted agreement than he would have paid according to the letter.

The necessity of a subscription presents the final problem. A "subscription" is the same as a "signing,"[4] and it is clear that Brenon's typewritten name, which according to his testimony was typed with the intent that it be tantamount to a written signature, is a sufficient subscription.[5] A problem here is that his wife, who owned the property

---

[3]This case thus differs from a case where no consideration at all is mentioned, such as William Weisman Realty Co. v. Cohen, 157 Minn. 161, 195 N. W. 898, or where the consideration expressed cannot be identified with reasonable certainty, as in George v. Conhaim, 38 Minn. 338, 37 N. W. 791. See, also, D. M. Osborne & Co. v. Baker, 34 Minn. 307, 25 N. W. 606, where we held that "for value received" was a sufficient expression.

[4]2 Corbin, Contracts, § 521; 4 Williston, Contracts (3 ed.) § 585.

[5]Conlan v. Grace, 36 Minn. 276, 30 N. W. 880; Restatement, Contracts, § 210.

with him in joint tenancy, apparently neither signed the letter nor authorized him in writing to sell her share. But this deficiency was at no time claimed or asserted before the trial court or in defendants' brief to this court. It was suggested for the first time upon oral argument. If it is a fact, it was not a part of the theory upon which the case was tried and submitted. We must therefore adhere to our well-settled rule that an unlitigated issue may not be asserted for the first time on appeal.[6]

We by no means intend to hold that Brenon's letter would be a sufficient memorandum in every case. We will overlook technical requirements only if proof of the oral contract is clear and uncontradicted as in this case where defendant admitted that a contract had been made. But those technical requirements are only aids to discern where the truth lies in a given case, and we will not blindly apply those technicalities if they lead to a conclusion repugnant to commonsense. As Professor Williston has said:

"In brief, the Statute 'was intended to guard against the perils of perjury and error in the spoken word.' Therefore, if after a consideration of the surrounding circumstances, the pertinent facts and all the evidence in a particular case, the court concludes that enforcement of the agreement will not subject the defendant to fraudulent claims, the purpose of the Statute will best be served by holding the note or memorandum sufficient even though it be ambiguous or incomplete."[7]

Most persuasive is defendant's admission during trial that a contract was in fact made between plaintiff and himself. Although we have followed the majority rule that admission of the contract does not preclude assertion of the statute of frauds,[8] an admission that a con-

---

[6]E. g., American Surety Co. v. Greenwald, 223 Minn. 37, 25 N. W. (2d) 681; Allen v. Central Motors, Inc. 204 Minn. 295, 283 N. W. 490.

[7]4 Williston, Contracts (3 ed.) § 567A; 2 Corbin, Contracts, § 498.

[8]Doyle v. Wohlrabe, *supra*; Holste v. Baker, 223 Minn. 321, 26 N. W. (2d) 473; Taylor v. Allen, 40 Minn. 433, 42 N. W. 292. The rule is based on the belief that it is more important that a seller not be tempted to perjure himself by falsely denying a contract than it is to give effect to

tract was made certainly cannot be ignored when all other evidence submitted supports the same conclusion. Even though it may be argued that the formal requirements contemplated by the statute are lacking, when all the evidence is taken into account we are of the opinion that the letter should be held a sufficient memorandum in this case.[9] The policy of the statute of frauds would be perverted if the admitted contract were not enforced. The judgment of the trial court is therefore affirmed.

Affirmed.

---

his judicial declarations. This rule, first announced by the English courts a century after passage of the first statute of frauds, has been disapproved by scholars and rejected by some American courts. Trossbach v. Trossbach, 185 Md. 47, 42 A. (2d) 905; Degheri v. Carobine, 100 N. J. Eq. 493, 135 A. 518; Zlotziver v. Zlotziver, 355 Pa. 299, 49 A. (2d) 779; Stevens, *Ethics and the Statute of Frauds*, 37 Cornell L. Q. 355; 2 Corbin, Contracts, § 498; 4 Williston, Contracts (3 ed.) § 567A.

[9]See Jones v. Jones, 333 Mo. 478, 63 S. W. (2d) 146, in which the Missouri court, although upholding the majority rule, thought that defendant's admission removed ambiguity from the evidence.